UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

PHILLIPS EXPLORATION, INC.,

    Plaintiff,

v.

DUSTIN C. TOMICH, SR., *et al.*,

    Defendants.

Case No. 2:11-CV-01081
JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Mark. R. Abel

## OPINION AND ORDER

This diversity action stems from a dispute over the renewal of an oil and gas lease between Plaintiff, Phillips Exploration, Inc. ("Phillips"), and Defendants Dustin C. Tomich, Sr., and Diane L. Tomich (collectively "Defendants"). The case is currently before the Court for consideration of the parties' cross Motions for Summary Judgment. (ECF Nos. 21, 23.) For the following reasons, the parties' Motions are **DENIED**.

### I. BACKGROUND

In August 2006, Defendants entered into an oil and gas lease ("the lease") with EOG Resources, Inc. ("EOG") relating to 87.4 acres of Defendant's property in Belmont County, Ohio. Defendants and EOG submitted a memorandum detailing the lease with the Belmont County Recorder's Office. In 2007, EOG assigned the lease to PC Exploration, Inc., which subsequently became Phillips. The assignment was also documented with the Belmont County Recorder's Office.

The initial lease term was for a period of five years from the effective date of August 7, 2006. (Dustin C. Tomich Decl. Ex. 1-A, ECF No. 21-1.) The lease period, however, was also

subject to a unilateral renewal provision, which states:

> EXTENSION. This lease may, at Lessee's option, be extended as to all or part of the lands covered hereby for an additional primary term of FIVE (5) years commencing on the date that this lease would have expired but for the extension. Lessee may exercise its option by paying or tendering to Lessor an extension payment of $40.00 per net acre for the land then covered by the extended lease. Said bonus is to be paid or tendered to the Lessor in the same manner as provided for in Paragraph four (4) hereof with regard to the payment of delay rentals. If Lessee exercises this option, the primary term of this lease shall be considered to be continuous, commencing on the date of the lease and continuing from that date to the end of the extended primary term. If Lessee's operations are delayed or interrupted as a result of any coal mining operations under any existing and effective coal lease, such delay will automatically extend the primary term of this oil and gas lease for a period of time equal to any delay or interruption. Lessor hereby grants any such extensions of this lease without necessity of an amendment to said lease.

(*Id.*) The lease's payment paragraph—incorporated in the above renewal provision—requires that "Lessee shall make or tender all payments due hereunder by check, payable to Lessor, at Lessor's last known address, and Lessee may withhold any payment pending notification by Lessor of a change in address." *Id.*

During the relevant period, Jill Geibel—an Associate Land Analyst for Phillips—was responsible for mailing deferred rental and lease renewal payments due pursuant to Phillips' oil and gas leases. (Geibel Decl. ¶ 5, ECF No. 23-2.) According to Ms. Geibel, she would cause Phillips to issue up to 100 checks per month for the purpose of lease payments. (*Id.* at ¶ 5.) Ms. Geibel described a standard process she followed to ensure that Phillips' lease payments were made each month. (*Id.* at ¶ 5.) Ms. Geibel specifically testified that Phillips maintains an electronic database that tracks when rental and renewal payments are due. (*Id.* at ¶¶ 6, 10.) From this database, Ms. Geibel produced lists to identify what rental and renewal payments were due for the upcoming month. (*Id.* at ¶¶ 7, 10, 13.) Other Phillips employees reviewed and approved

2

the lists of monthly rental/renewal payments. (*Id.* at ¶¶ 9–10, 13.)

After approval of a consolidated list of rental and renewal payments, Ms. Geibel averred that she next generated a list of checks to be issued. (Geibel Decl. ¶ 14.) Ms. Geibel would then check this list against the individual leases. (*Id.* at ¶ 15.) According to Geibel, she physically received checks from Phillips based on this list. (*Id.* at ¶ 16.) Ms. Geibel stated that she would then mail the checks to the lessors. (*See id.* at ¶¶ 19–23.) For renewal payments, Ms. Geibel testified that she also prepared a cover letter—dated the first of the relevant month—explaining the purpose of the payment. (*Id.* at ¶ 20.) For lease renewal payments, Ms. Geibel also stated that she personally typed the address on each envelope.[1] (*Id.* at ¶ 22.)

Once again, Phillips received an assignment of the lease in 2007. Ms. Geibel testified that, in August 2010, Phillips learned that Defendants had changed addresses. (Geibel Decl. ¶ 17; Pl.'s Mot. Summ J. Ex. K, ECF No. 23-2.) Although the address was updated in Phillips' database, the database contained a zip code of 43850 rather than the correct zip code of 43950. (Geibel Decl. ¶¶ 18, 22.) According to Ms. Geibel, Phillips sent a rental check to Defendant at this updated address—with the wrong zip code—in August 2010, and the check was subsequently cashed.[2] (*Id.* at ¶¶ 25, 29; Pl.'s Mot. Summ J. Ex. P, ECF No. 23-2.)

Ms. Geibel averred that, following the above procedure, she mailed, via single piece first-class mail, Phillips' lease payments for August 2011 on or about August 3, 2011. (*See* Geibel Decl. ¶¶ 20, 23.) According to Ms. Geibel, these mailings included sending a cover letter and a

---

[1] For rental payments Ms. Geibel relied on a "windowed envelope" system. (Geibel Decl. ¶ 19.)

[2] After August 7, 2011, Phillips also sent certified mail that Defendants apparently received at this address. (*See* Geibel Decl. ¶ 35.)

3

check in the amount of $3,933.41—covering both the renewal and a separate rental payment—to Defendants. (*See* Geibel Decl. ¶¶ 16, 20, 23, 26.) Phillips' business records reflect that the cover letter to Defendants was dated August 1, 2011 and that it issued a check to Defendants on August 3, 2011. (Pl.'s Mot. Summ J. Exs. L, M, ECF No. 23-2.) Although Ms. Gabriel acknowledged that the mailing contained the wrong zip code, 43850, she further stated that no mailing for Defendants was returned by the U.S. Postal Service. (*Id.* at ¶¶ 26, 31.) Ms. Geibel admitted during her deposition that she did not make copies of either the checks or envelopes before mailing. (Geibel Dep. 26, ECF No. 25.) Ms. Geibel also testified that she was out of the office on vacation August 4, 2011 and did not return until August 8, 2011. (*Id.* at 33, 43–44.)

Defendants deny receiving any renewal payment by the expiration of the initial lease term. (Dustin C. Tomich Decl. ¶ 8; Diane L. Tomich ¶ 8, ECF No. 21-2.) In November 2011, Defendants filed an affidavit with the Belmont County Recorder's Office stating that they had received no payment to extend the oil and gas lease, would refuse to accept any such payment if offered at that time, and that the lease was "null and void." (Pl.'s Mot. Summ J. Ex. U, ECF No. 23-2.) Phillips filed a counter affidavit in December 2012 averring that it had exercised its renewal option and that the lease remained in full force and effect. (Pl.'s Mot. Summ J. Ex. V, ECF No. 23-2.)

Phillips filed this action in December 2011. Phillips specifically brings claims for declaratory judgment, breach of contract, specific performance, injunctive relief, and slander of lease interest. Defendants subsequently filed counterclaims for declaratory judgment, injunctive relief, and slander of lease interest. Phillips moves the Court for summary judgment on its declaratory judgment and specific performance claims as well as for summary judgment as to

4

liability on its breach of contract claim. Phillips also moves for summary judgment as to all of Defendants counterclaims. Defendants move for summary judgment on all of their counterclaims as well as all of Phillips' claims.

## II. STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323 (internal quotations omitted). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Liberty Lobby, Inc.*, 477 U.S. at 248.

5

## III. ANALYSIS

Although the parties bring multiple causes of action, each party acknowledges that the claims turn on whether Phillips successfully renewed the lease. Phillips contends that it tendered the extension payment by mailing the payment to Defendants, regardless of whether payment was actually received. Defendants maintain that under the terms of the lease actual receipt of payment was required for renewal, that the renewal payment was not properly mailed, and that Defendants never received payment. Defendants also assert that a dispute of fact exists as to whether Phillips actually mailed the renewal payment.

To resolve the parties dispute in this case, the Court must interpret the language of the lease itself. In particular, the Court must decide whether the lease language required actual receipt of the renewal payment for successful renewal. Under Ohio law,[3] "[i]t is well established that leases are contracts and, as such, are subject to traditional rules governing contract interpretation." *Heritage Court, L.L.C. v. Merritt*, 187 Ohio App.3d 117, 122 (Ohio Ct. App. 2010). In interpreting contractual language, the Court's purpose "is to ascertain and give effect to the intent of the parties." *Foster Wheeler Enviresponse, Inc. v. Franklin Cnty. Convention Facilities Auth.*, 78 Ohio St.3d 353, 361 (Ohio 1997). The Court generally presumes that the intent of the parties rests within the language of the contract. *Id.* "Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." *Id.* (internal quotations omitted). Moreover, "[w]hen the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the

---

[3] The parties both acknowledge that Ohio law applies to the lease.

6

parties."[4] *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 219 (Ohio 2003).

## A.     Tendering of Payment

Here, the renewal provision of the lease required Phillips to either pay or tender the extension payment within the initial lease period. (Dustin C. Tomich Decl. Ex. 1-A.) This Court recently interpreted the meaning of "tender" within an identical lease renewal provision:

> Ohio case law instructs that "'[t]ender' generally means to offer or hold something out, especially in fulfillment of the requirements of law." *Vannoy v. Capital Lincoln–Mercury Sales, Inc.*, 88 Ohio App.3d 138, 147, 623 N.E.2d 177, 184 (Ohio 4th Dist. Ct. App. 1993). Ohio law also provides that "[t]he essential characteristics of a tender are an unconditional offer to perform, coupled with ability to carry out the offer and production of the subject matter of the tender." *Walton Commercial Enters., Inc. v. Ass'ns, Conventions, Tradeshows, Inc.*, No. 91AP–1458, 1992 WL 132451, at *2 (Ohio 10th Dist. Ct. App. June 11, 1992). Thus, "[w]here one party tenders the other '. . . an amount reflecting the entirety of its legal obligation, that obligation is fulfilled . . . .'" *Id.* (quoting *Parker v. Unigard Ins. Co.*, 44 Ohio App.2d 199, 201, 337 N.E.2d 181, 183 (Ohio 1st Dist. Ct. App.1975)). The end result is that the lease plainly and unambiguously allowed Phillips to renew by *offering* its renewal check.

*Phillips Exploration, Inc. v. Reitz*, No. 2:11–cv–920, 2012 WL 6594915, at *3 (S.D. Ohio Dec. 18, 2012) (Frost, J.). Consequently, the Court concluded that, under the terms of the lease provision, the offering of payment by mail to the defendant's last known address satisfied the requirements of renewal, regardless of actual receipt. *Id.*

The Court finds the *Reitz* Court's interpretation of tender persuasive.[5] Specifically, the

---

[4] As Defendants stress, Ohio law also recognizes " the long-standing rule of contract construction that a contract must be construed against the drafter." *Reida v. Thermal Seal, Inc.*, No. 02AP-308, 2002 WL 31819831, at *3 (Ohio Ct. App. Dec. 17, 2002). This rule, however, is secondary and applies when a contract's language is ambiguous and when primary rules of construction do not clarify the meaning of the contract. *Id.* (collecting authority).

[5] The Court notes that, in following the reasoning of *Reitz*, it is not applying the doctrine of collateral estoppel nor is it treating *Reitz* as mandatory authority.

7

above definition of tender is both consistent with Ohio law and the common definition of tender as "an unconditional offer of money or performance to satisfy a debt or obligation." Black's Law Dictionary (9th ed. 2009). Moreover, a more stringent definition of tender, requiring either receipt or acceptance of the renewal payment, would be in tension with the lease's other terms. First, the language of the renewal provision gives Phillips the power to extend the lease and does not require Defendants to accept the renewal payment. Second, if tender requires actual receipt of payment, it becomes difficult to distinguish between Phillips' option of "paying or tendering" the extension payment, rendering the language mere surplusage. *See Reitz,* 2012 WL 6594915, at *3 ("[T]o read 'tender' as wholly synonymous with 'payment' so that the nuances of Ohio law regarding tendering and the mailbox rule would fall away in favor of accepting curious redundancy as intentional.").[6]

Defendants fault the *Reitz* decision for failing to interpret the lease within the context of oil and gas lease law. Defendants do not explain, however, how such a context alters the meaning of the term tender. In fact, at least some authority within the oil and gas context supports *Reitz's* interpretation. *APC Operating Partnership v. Mackey,* 841 F.2d 1031, 1035–36 (10th Cir. 1988) (holding that term "tender" included an offer by mail and citing Oklahoma's mailbox rule for the proposition that an extension is exercised upon mailing "even though it was never received"); *but cf. Keeler v. Dunbar,* 37 F.2d 868, 869 (5th Cir. 1930) (holding, without specifically addressing the meaning of tender, that when a lessee chose to send payment via telegraph it bore the risk of failure to deliver).

Finally, the Court also finds, consistent with *Reitz,* that tendering payment via mail was

---

[6] The Court will discuss application of Ohio's mailbox rule below.

8

appropriate under the terms of the lease. *See id.* at 3 n.3 ("Because the contractual language does not limit the manner of tender, offer by mail or personal delivery falls fairly within the lease."). Defendants imply that mailing of the renewal payment was improper, or at the very least actual receipt was required, because the lease does not explicitly provide for mailing of payments. At the same time, however, the lease does not prohibit tender through mail. Rather, it simply provides that Phillips could make tender by check at Defendants' last known address. (Dustin C. Tomich Decl. Ex. 1-A.) Although this language does not expressly allow for tender via mail, a natural reading of the provision reflects that payment mailed to Defendants' last known address would be acceptable. Moreover, the record evidence reflects that Defendants accepted rental payments, without complaint, that Phillips sent via mail.

## B. The Mailbox Rule

Having determined that the mailing of the renewal check was a proper form of tender, the Court will next consider the related issue of the mailbox rule. The parties disagree as to what form of the rule, if any, should apply. Defendants maintain that the mailbox rule is only a presumption, and they are entitled to rebut actual delivery. Phillips, on the other hand, maintains that, applying the mailbox rule, renewal was effective upon mailing, regardless of actual receipt.

Ohio recognizes at least two versions of the mailbox rule. First, under certain circumstances—such as situations requiring notice to a party—Ohio law follows a general "presumption, sometimes called the 'mailbox rule' that, once a notice is mailed, it is presumed to be received in due course." *LSF6 Mercury REO Invests.Trust Series 2008-1 c/o Vericrest Fin., Inc. v. Locke*, No. 11AP–757, 2012 WL 4502457 (Ohio Ct. App. Sept. 28, 2012). A party may then rebut this presumption through evidence of non-receipt. *Id.* Second, Ohio case law applies

9

a form of the mailbox rule relating to contract formation. Specifically, Ohio courts have held that "[t]he 'mailbox rule' states that in the absence of any limitation to the contrary in the offer, an acceptance is effective when mailed because the offeror has the power to condition the acceptance of the offer on actual receipt." *Gold Key Lease, Inc. v. Hood*, No. 00 C.A. 185, 2001 WL 1137315, at *3 (Ohio Ct. App. Sept. 20, 2001). Accordingly, under this version of the rule, receipt of the mailing is not required. *See Casto v. State Farm Mut. Auto. Ins. Co.*, 72 Ohio App.3d 410, 413 (Ohio Ct. App. 1991) ("The well-established general rule of contract formation is that an acceptance transmitted in a form invited by the offer is operative as soon as it is put out of the offeree's possession, regardless of whether it ever reaches the offeror.").

The Court finds the second iteration of the mailbox rule applicable to this case. *See Reitz*, 2012 WL 6594915, at *3 ("Another rule of Ohio law provides that as soon as Phillips offered the renewal check by placing it into the mail, Phillips renewed the lease regardless of whether [the defendant] ever actually received the check."). In particular, the renewal provision fits within the contract-formation context. The terms of the lease gave Phillips the right to extend the lease term by tendering additional payment. Once again, the renewal provision only requires tender of payment and extension was not conditioned upon actual receipt of payment. Accordingly, the mailing of an extension payment would have constituted an acceptance of the extension, regardless of actual receipt.

To be entitled to the benefit of the mailbox rule, however, a party must still demonstrate that the mailing was "properly prepared, addressed, stamped, and mailed." *Reitz*, 2012 WL 6594915, at * 3. Ohio courts have specifically held that the mailing must be "correctly addressed and stamped" and "placed in the mails." *Casto,* 72 Ohio App. 3d at 414 (internal quotations

omitted).

### 1. Properly Addressed

In applying the mailbox rule to the facts of this case, the parties dispute whether the purported mailing was "properly addressed." In particular, the parties dispute whether an incorrect zip code makes an address improper.

Unfortunately, there is limited Ohio authority addressing when mail is considered properly addressed within the context of the mailbox rule. In an unpublished decision, one Ohio Court of Appeals refused to apply the presumption of due receipt to a letter that (1) failed to name the specific division of the government entity it was being sent to and (2) did not indicate the correct zip code. *Blackburn Sec., Inc. v. Ohio Dep't of Commerce*, No. 13660, 1993 WL 179253, at *3–4 (Ohio Ct. App. May 24, 1993). The *Blackburn* decision reasoned:

> While it is conceivable that the letter could have been delivered despite these minor flaws in the address, a court cannot presume that it was. To obtain the benefits of the presumption, a party must establish that the letter was properly addressed; it is not sufficient to prove that the address was close to being correct.

*Id.* at *3.

Other authority, however, suggests a different conclusion. Although case law is mixed, many federal courts addressing similar issues—within a variety of context—have held that a mailing need not contain a correct zip code to be considered properly addressed. *See, e.g., Santoro v. Principi*, 274 F.3d 1366, 1370 (Fed. Cir. 2001) (holding that although mailing contained an incorrect zip code it was still properly addressed); *In re Longardner & Assocs., Inc.*, 855 F.2d 455, 460 (7th Cir.1988) (holding that although an incorrect zip code perhaps weakened the presumption of delivery, the presumption was still raised); *Punzalan v. F.D.I.C.*, 633 F.

11

Supp.2d 406, 413 (W.D. Tex. 2009) ("[O]ther circuits have held that the use of an incorrect zip code alone does not operate to rebut the presumption of receipt . . . ."); *cf. also Akey v. Clinton Cnty., N.Y.*, 375 F.3d 231, 235 (2nd Cir. 2004) ("[W]e note that courts have expressed the view that even if a zip code is slightly incorrect, as here where the County transposed two digits, notice is adequate for the purposes of due process because the Postal Service will deliver [that] letter to the correct street address.") (internal quotation omitted); *but see Busquets-Ivars v. Ashcroft*, 333 F.3d 1008, 1010 (9th Cir. 2003) (holding that "penalty mail" required a proper zip code in order to be "properly directed").

Federal standards governing U.S. mail also prove instructive in this case.[7] Regulations applying to the United States Postal Service incorporate the Domestic Mail Manual ("DMM"), a document relating to mailing standards for the United States Postal Service. 39 C.F.R. § 111.1. Pursuant to the DMM, a complete address includes a correct five-digit zip code. Domestic Mail Manual § 602.1.4 (July 2013). At the same time, however, all mail does not require a complete address. Specifically, single-piece first class mail, the form of mail at issue in this case, does not require a zip code. *Id.* at § 602.1.3.

Considering the above authority, Phillips maintained the proper address for Defendants. Here, the relevant facts are established within the record. Phillips maintains an electronic

---

[7] In addition to highlighting federal standards, Phillips also submits the Declaration of former postal inspector Peter Wade. (Wade Decl., ECF No. 23-2.) Mr. Wade avers based on his postal experience, knowledge of mailing standards, and research into this matter that the renewal would have been delivered, despite the incorrect zip code, under the standard postal service process. (*Id.* at ¶ 34.) The parties dispute whether Mr. Wade offers an admissible expert opinion. For the reasons described below, the Court finds that Phillips had the proper address for Defendants, regardless of Mr. Wade's Declaration. Accordingly, the Court finds it unnecessary to reach this issue.

database that included the addresses of its lessors. It is undisputed that this database contained the correct street, city, and state for Defendants. Nevertheless, a single digit of the zip code was incorrect. Finally, the record reflects that Ms. Geibel mailed rental and renewal payments via single piece first-class postage.

Under the circumstances of this case, a single digit error in the zip code was not enough to make the otherwise correct address improper. Importantly, Phillips sent the payments in question via single price first class mail. Accordingly, following DMM guidelines, a zip code was not even required to satisfy the proper address elements. The Court acknowledges, as *Blackburn* recognized, that it is not the Court's role to guess as to whether a letter will be delivered despite minor flaws.[8] Nevertheless, given the type of mail involved in this case, a correct, city, and state was enough to make the address proper under applicable mailing standards. *Cf. Santoro*, 274 F.3d at 1370 ("[A]n address containing errors inconsequential to delivery is still proper.").

### 2. Actually Mailed

Of course, whether or not the renewal was properly addressed, Phillips needed to actually mail the renewal to Defendants.[9] The parties dispute whether the renewal was actually mailed.

Ohio courts recognize that a business may inferentially prove mailing by established that

---

[8] It is noteworthy, however, that the record indicates that Defendants received other mailings—including the August 2010 rental payment—that Phillips sent to the address (with an improper zip code).

[9] In *Reitz*, the Court found that "[t]here [was] no dispute of fact as to whether Phillips mailed the renewal check in a timely and proper manner to the appropriate address." 2012 WL 6594915, at *3. Consequently, the *Reitz* Court did not address the issue of whether the plaintiff had proven actual mailing within the prescribed period.

13

it had a system of mailing that it strictly followed. *Avemco v. Eaves*, 67 Ohio App.3d 563, 567 (Ohio Ct. App. 1990).[10] Specifically, in considering whether mailing has occurred, "[b]oth Ohio and federal courts recognize that proof of a business system of preparing and mailing letters, and compliance with such a custom in the particular instance, is sufficient to establish proof of mailing." *Toledo v. Schmiedebusch*, 192 Ohio App.3d 402, 409 (Ohio Ct. App. 2011). An opponent, however, may contradict such proof by submitting evidence—including denial of receipt—indicating that the letter was not actually mailed. *Id.* at 410 ("[A] sworn denial of receipt by the addressee creates a question of fact for the jury as to whether the letter was actually mailed or delivered."); *see also Simpson v. Jefferson Standard Life Ins. Co.*, 465 F.2d 1320, 1324 (6th Cir. 1972) (holding, under Ohio law, that an "affidavit of non-receipt created an issue of fact as to whether or not the premium notice was mailed"); *cf. also Canter v. Christopher*, 80 Ohio App. 465, 468–69 (Ohio Ct. App. 1992) (holding that issue of fact existed as to mailing based on denial of receipt).

Upon review of the evidence, the Court finds that a genuine factual dispute exists. On the one hand, Phillips provides sufficient evidence to allow for an inference that it mailed the renewal payment in a timely fashion. Ms. Geibel, the Phillips employee responsible for sending lease payments, detailed that she followed a systemized process for identifying the rental and renewal payments that Phillips needed to make each month. After having Phillips issue checks, she would then address the renewal envelopes mail the rental and renewal payments. According to Ms. Geibel, she followed this process in August 2011 when the renewal payment became due

---

[10] The *Avemco* court recognized ambiguity under Ohio law as to whether a custom of mailing "created a permissive inference or a rebuttable presumption." 67 Ohio App.3d at 902.

14

for Defendants' lease.

On the other hand, drawing inferences in Defendants' favor, sufficient evidence exists to create a factual dispute as to whether Phillips actually mailed the renewal payment. First, Defendants both have averred that they never received the renewal payment. Furthermore, as detailed above, the record reflects that other correspondence sent to the relevant address reached Defendants. Consequently, crediting Defendants testimony, the trier of fact could infer that—on this particular occasion—the correspondence was not actually mailed.

Second, construing Ms. Geibel's testimony in Defendants' favor, there is room to doubt whether Ms. Geibel followed the established system and successfully mailed the renewal payment in this case. Although Ms. Geibel described Phillips' process for identifying payments, this system was still ultimately dependent on Ms. Geibel addressing—including personally typing the addresses for renewal payments in August 2011—and properly mailing approximately one hundred payments a month. Moreover, construing the evidence in Defendants favor, a reasonable jury could infer that Ms. Geibel's process was rushed in August 2011. In particular, Defendants renewal check was not issued until August 3, 2011 and Ms. Geibel went on vacation beginning on August 4, 2011. Accordingly, combining the potential for human error with Defendants' denial of receipt, a reasonable jury could conclude that Phillips never actually mailed renewal payment.

Ultimately, the Court finds that neither party is entitled to summary judgment.[11]

---

[11] Phillips briefly contends that Defendants slander of title counterclaim must fail because Defendants cannot establish malice or reckless disregard. Phillips, however, fails to develop this line of argument beyond asserting that its statements regarding the lease were true because it successfully renewed the lease. Because the Court finds a factual issue remaining as to renewal, it will not grant summary judgment as to this counterclaim.

15

Applying the above framework, Phillips successfully renewed the lease if it can establish that it actually mailed the August 2011 renewal payment in a timely manner. Nevertheless, a factual dispute remains as to whether the renewal was actually sent.

## IV. CONCLUSION

For the foregoing reasons, the parties' cross Motions for Summary Judgment are **DENIED**. (ECF No. 21, 23.)

**IT IS SO ORDERED.**

8-1-2013
**DATE**

**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**

16